# United States Court of Appeals
## For the First Circuit

Nos. 12-2301
     13-1339

UNITED STATES OF AMERICA,

Appellee,

v.

TOMÁS SEPÚLVEDA-HERNÁNDEZ, a/k/a TOMMY,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colón, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Selya, Circuit Judges.

Irma R. Valldejuli for appellant.
Julia Díaz-Rex, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

May 2, 2014

**SELYA, Circuit Judge.** The appeals in this criminal case raise two questions of first impression in this circuit. The first asks whether the statute doubling the maximum available penalty for drug distribution in close proximity to a youth center, see 21 U.S.C. § 860(a), creates an independent substantive offense or, instead, operates merely as a sentence-enhancing factor. We conclude that this statute does create an independent offense. We also conclude, however, that the evidence offered at trial was insufficient to support convictions for that offense.

This tees up the second novel question, which asks whether, notwithstanding that the evidence was insufficient to ground convictions under section 860(a), the defendant can be held to account on a lesser included offense theory under 21 U.S.C. § 841(a)(1). We answer this question in the affirmative.

After dispatching the remainder of the defendant's asseverational array, we vacate the convictions and sentence under section 860(a), order the entry of convictions under section 841(a)(1), and remand for resentencing. At the same time, we affirm a related $1,000,000 criminal forfeiture judgment. The tale follows.

I. TRAVEL OF THE CASE

From 2000 to 2008, defendant-appellant Tomás Sepúlveda-Hernández was the marijuana supplier to, and a co-owner of, an open air drug market in La Trocha Ward, Vega Baja, Puerto Rico. This

drug point was located in close proximity to a public basketball court.

In December of 2008, a federal grand jury indicted the defendant, along with fifty-eight others, on charges stemming from the distribution of marijuana and crack cocaine. For reasons that need not concern us, the crowd thinned and the defendant stood trial alone. Following ten days of trial, a jury found the defendant guilty of conspiracy to possess with intent to distribute at least 50 grams of crack cocaine and at least 100 kilograms of marijuana (count 1), see 21 U.S.C. §§ 841(a)(1) (drug distribution), 846 (conspiracy), as well as aiding and abetting in the distribution of at least 100 kilograms of marijuana (count 3), see 18 U.S.C. § 2 (aiding and abetting). On a special verdict form, the jury indicated that the culpable activities described in counts 1 and 3 took place "within 100 [feet] of a private or public youth center . . . intended primarily for use by persons under 18 years of age." The jury also found against the defendant on a related criminal forfeiture count (count 4). See 21 U.S.C. § 853(a). The district court elevated the defendant's offense level in light of the jury's finding that drug sales had occurred in close proximity to a youth center, see USSG §2D1.2(a)(1); imposed a 210-month incarcerative sentence; and set the forfeiture amount at $1,000,000.

These timely appeals followed.  In them, the defendant mounts a wide variety of challenges to his convictions, his sentence, and the forfeiture judgment. We examine these challenges sequentially.

## II.  SUFFICIENCY OF THE EVIDENCE

The defendant asserts that the government's evidence was insufficient in two respects.  He argues, first, that the proof failed to establish that the drug point operated within 100 feet of a youth center.  He argues, second, that the government failed to prove that he had any role at all in the conspiracy.

We review preserved sufficiency challenges de novo.  See United States v. Gobbi, 471 F.3d 302, 308 (1st Cir. 2006).  In conducting our inquiry, we examine the evidence "in the light most agreeable to the prosecution and decide whether that evidence, including all plausible inferences extractable therefrom, enables a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged crime." United States v. Ortiz de Jesús, 230 F.3d 1, 5 (1st Cir. 2000) (internal quotation mark omitted).  We will uphold a conviction as long as the jury's verdict "is supported by a plausible rendition of the record." United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992).

### A.  The Charged Crimes.

The charges in this case (conspiracy and aiding and abetting) implicate 21 U.S.C. § 860(a), which provides that any

-4-

person who commits certain drug-related crimes "within 100 feet of a public or private youth center" shall be "subject to [] twice the maximum punishment" otherwise authorized.  The term "youth center" is defined as "any recreational facility and/or gymnasium (including any parking lot appurtenant thereto), intended primarily for use by persons under 18 years of age, which regularly provides athletic, civic, or cultural activities."  Id. § 860(e)(2).  The defendant concedes that the drug market described by the government was within 100 feet of a public basketball court, but he insists that the government failed to prove that the facility was "intended primarily" for use by minors.

As a threshold matter, the parties wrangle about the quantum of proof required to establish proximity to a "youth center."  The defendant posits that section 860(a) creates an independent substantive offense, so that proximity to a youth center is an element of that crime that must be proven to the jury beyond a reasonable doubt.  See United States v. Goodine, 326 F.3d 26, 28 (1st Cir. 2003) (explaining that elements of crimes must be proven to a jury beyond a reasonable doubt).  The government demurs.  It posits that proximity to a youth center is simply a sentence-enhancing factor that must only be proven to the judge by preponderant evidence.  See id. (explaining that sentencing factors may be found by the judge under a preponderance standard).

The distinction between substantive crimes and sentencing factors can often be enigmatic. In any given case, however, this distinction boils down to a question of statutory interpretation.

In interpreting the statute at issue here, we do not write on a pristine page. No fewer than ten of our sister circuits have grappled with the same question, and all of them have concluded that section 860(a) creates an independent substantive offense, not merely a sentence-enhancing factor. See United States v. Osborne, 673 F.3d 508, 513 (6th Cir. 2012) (collecting cases). We have been unable to find (and the government has not cited) any contrary circuit court precedent.

In our view, the consensus position is correct. A statute ought to be read as a whole. See FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132-33 (2000); O'Connell v. Shalala, 79 F.3d 170, 176 (1st Cir. 1996). Here, subsection (d) of section 860 states that persons "convicted under this section" are only parole-eligible under certain circumstances. Similarly, subsection (b) discusses the effects of "a prior conviction under subsection (a)." It would be strange for Congress to describe a person as having been "convicted" under a sentencing factor — and we do not think that Congress indulged such an awkward locution here. Thus, we maintain the unanimity of the courts of appeals and hold that section 860(a) creates an independent substantive offense.

Given this holding, our task is to plumb the record to determine whether the evidence is sufficient to allow any rational factfinder to conclude beyond a reasonable doubt that the basketball court near the drug market was intended primarily for the use of minors. The government's evidence on this point is distressingly vague. It includes the testimony of a longtime resident that "different people, children would go there to play, young people, old people, adults." It also includes the testimony of a municipal official who recounted that the court is made available for basketball tournaments and other community uses. Neither piece of evidence speaks to whether the facility was "intended primarily" for the use of minors.

In an effort to fill this void, the government relies on several surveillance videos of controlled drug buys, which show a few children and young people (among many others) in the background. The government's reliance is mislaid: it defies reason to think that this video evidence has the capacity to prove that the basketball court was intended primarily for the use of minors.

Words in a statute have consequences. "[P]rimarily" means "essentially; mostly; chiefly; principally." The Random House Dictionary of the English Language 1537 (2d ed. 1987). It follows, we think, that Congress did not intend for drug sales at specific locations to trigger sharply increased penalties simply

because minors happen to be in the vicinity of a particular facility from time to time.

In this case, the government has not offered a shred of evidence that the municipality either constructed or maintained the basketball court chiefly or principally for the enjoyment of minors. Nor has it produced even a scintilla of evidence that the court's regular use was mainly or mostly by minors. Given this paucity of proof, the inference that the government asks us to draw is insupportable.

In a Rumpelstiltskin-like effort to turn dross into gold, the government lauds the decision in United States v. Lee, 242 F. App'x 209 (5th Cir. 2007) (per curiam). There, the court upheld a youth center proximity finding with respect to drug distribution near the TEEN F.L.O.W. Youth Center in Midland, Texas. See id. at 210, 212. The court's discussion of the issue comprises only two sentences. It states that "there was uncontroverted and unchallenged testimony that the [center] was a 'youth center' where children played basketball." Id. at 212. That is far removed from the record here — a record that contains neither evidence of the municipality's intent to create a facility that might qualify as a youth center nor evidence quantifying (or even estimating) the extent to which the basketball court was used by minors.

That ends this aspect of the matter. The government has the burden of establishing every element of a charged crime, see

-8-

United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995), and carrying that burden requires more than hopeful supposition laced with a large dose of conjecture. Because the evidence here falls woefully short of establishing that the basketball court was intended primarily for the use of persons under the age of 18, the defendant's convictions under section 860(a) cannot stand.

### B. The Lesser Included Offense.

Our next task is to gauge the repercussions attendant to vacating the section 860(a) convictions. The government asks that we direct the court below to enter convictions for lesser included offenses — conspiring with, and aiding and abetting, the drug distribution enterprise in violation of section 841(a)(1) (a statute that does not include the element of proximity to a youth center).[1] The defendant resists the entry of such an order.

Congress has given the courts of appeals authority to "affirm, modify, vacate, set aside or reverse any judgment . . . and direct the entry of such appropriate judgment . . . as may be just under the circumstances." 28 U.S.C. § 2106. The courts of appeals have readily embraced the sensible practice of using section 2106 as a vehicle for entering lesser included offense convictions. See Rutledge v. United States, 517 U.S. 292,

---

[1] Section 841(a)(1) makes it unlawful to "distribute . . . or possess with intent to . . . distribute . . . a controlled substance" knowingly or intentionally. Proof of no other or further element is required.

305-06 (1996) (discussing practice); <u>United States</u> v. <u>Romano</u>, 137 F.3d 677, 680-81 (1st Cir. 1998) (similar).

The existence of this authority, however, does not give the courts of appeals free rein. To determine whether the circumstances of a particular case create an environment suitable for the exercise of section 2106 authority, the courts have developed a multi-step test. <u>See</u>, <u>e.g.</u>, <u>Rutledge</u>, 517 U.S. at 305 n.15; <u>Allison</u> v. <u>United States</u>, 409 F.2d 445, 451 (D.C. Cir. 1969) (per curiam). Although this court has not yet had the occasion to speak to this test, we hold today, as have many of our sister circuits, <u>see</u>, <u>e.g.</u>, <u>United States</u> v. <u>Rojas Alvarez</u>, 451 F.3d 320, 328 (5th Cir. 2006); <u>United States</u> v. <u>Dhinsa</u>, 243 F.3d 635, 674-75 (2d Cir. 2001); <u>United States</u> v. <u>Smith</u>, 13 F.3d 380, 383 (10th Cir. 1993); <u>Allison</u>, 409 F.2d at 451; <u>see</u> <u>also</u> <u>United States</u> v. <u>Petersen</u>, 622 F.3d 196, 206-07 & n.6 (3d Cir. 2010) (applying modified version of test), that the multi-step test provides the proper analytic framework in a section 2106 inquiry.

We synthesize the teachings of the case law. The multi-step test demands an inquiry, first, into whether the trial evidence fails to support one or more elements necessary to the conviction. If not, further inquiry is unwarranted. If, however, this first step is satisfied, we proceed to ask, second, whether the trial evidence is sufficient to sustain each and every element of a different offense; third, whether that different offense is a

lesser included offense of the offense of conviction; and fourth, whether any injustice or unfair prejudice will inure to the defendant by directing the entry of a conviction for the lesser included offense. We administer this test here.

In the case at hand, the first and third factors need not detain us. As to the first factor, we already have concluded that the evidence is insufficient to establish the youth center proximity element of a section 860(a) offense. See supra Part II(A). As to the third factor, it is nose-on-the-face plain that a section 841(a)(1) violation is a lesser included offense of section 860(a) because the elements of the former are a subset of the elements of the latter. See United States v. Jones, 489 F.3d 243, 254 (6th Cir. 2007); United States v. Jackson, 443 F.3d 293, 301 (3d Cir. 2006); United States v. Carpenter, 422 F.3d 738, 747 (8th Cir. 2005); United States v. Kakatin, 214 F.3d 1049, 1051 (9th Cir. 2000); United States v. Parker, 30 F.3d 542, 553 (4th Cir. 1994); United States v. Freyre-Lazaro, 3 F.3d 1496, 1507 (11th Cir. 1993); see also United States v. Fenton, 367 F.3d 14, 24 (1st Cir. 2004) (agreeing with parties' concession on point).

The second factor requires consideration of whether the evidence would clearly support a conviction under section 841(a)(1). The defendant does not gainsay the drug market's operation but, rather, asserts that no credible evidence establishes that he played any part in the conspiracy.

-11-

To counter this assertion, the government relies principally on the testimony of a trio of cooperating coconspirators (Sonia Ortiz, Luis Camacho, and Roy Román De Jesús). Each of these individuals worked at the drug point in some capacity, and each testified extensively about its operations. The three coconspirators identified the defendant as a marijuana supplier to, and a co-owner of, the drug point. Unless there is some basis for disregarding it, this evidence suffices to defeat the defendant's claim of evidentiary insufficiency.

The defendant contends, though, that this inculpatory testimony is not creditworthy. He argues that these witnesses had little or no personal knowledge of his role in the business but, rather, simply parroted what they had heard from others. For example, Ortiz testified that Jimmy Figueroa, another coconspirator, "told me [that the defendant] is still the owner of the drug point." Similarly, Camacho testified that Ortiz and some pushers at the drug point had spoken to him about the defendant's leadership role in the drug-distribution ring. Other examples abound.

The district court admitted the disputed statements into evidence after conducting a careful inquiry under <u>United States</u> v. <u>Petrozziello</u>, 548 F.2d 20, 22-23 (1st Cir. 1977).[2] It confirmed

---

[2] Under <u>Petrozziello</u> and its progeny, "[t]he proponent of the statement bears the burden of establishing, by a preponderance of evidence, that a conspiracy embracing both the declarant and the

-12-

that each out-of-court statement was made by a coconspirator during and in furtherance of the conspiracy. <u>See</u> Fed. R. Evid. 801(d)(2)(E); <u>United States</u> v. <u>Piper</u>, 298 F.3d 47, 51-52 (1st Cir. 2002). The defendant neither challenges the court's <u>Petrozziello</u> determinations nor articulates any plausible rationale for disregarding those carefully compiled findings. The challenged testimony was, therefore, not hearsay and admissible for the truth of the matter asserted pursuant to the dictates of Rule 801(d)(2)(E). <u>See United States</u> v. <u>Sánchez-Berríos</u>, 424 F.3d 65, 74-75 (1st Cir. 2005); <u>Ortiz</u>, 966 F.2d at 714-16.

Undaunted, the defendant makes the curious argument that, even if this testimony was not excludable as hearsay, it rested on rumor and, thus, was insufficiently reliable to warrant a guilty verdict. This argument lacks force. Within wide limits, not approached here, it is the jury's role — not the role of an appellate court — to determine the weight to be given to a witness's testimony and to assess the witness's credibility. <u>See</u>

defendant existed, and that the declarant uttered the statement during and in furtherance of the conspiracy." <u>United States</u> v. <u>Bradshaw</u>, 281 F.3d 178, 283 (1st Cir. 2002) (internal quotation marks omitted). Such statements are typically admitted conditionally, subject to a later finding by the court, supported by extrinsic evidence (other than the statements themselves), "sufficient to delineate the conspiracy and corroborate the declarant's and the defendant's roles in it." <u>United States</u> v. <u>Piper</u>, 298 F.3d 47, 52 (1st Cir. 2002). "The trial court's final determination is known in this circuit as a <u>Petrozziello</u> determination." <u>United States</u> v. <u>Pérez-Ruiz</u>, 353 F.3d 1, 12 (1st Cir. 2003).

-13-

United States v. Luna, 649 F.3d 91, 101 (1st Cir. 2011); United States v. O'Brien, 14 F.3d 703, 707 (1st Cir. 1994). Thus, even the uncorroborated account of a single coconspirator can ground a conviction if credited by the factfinder. See, e.g., United States v. Meises, 645 F.3d 5, 12 (1st Cir. 2011); United States v. Torres-Galindo, 206 F.3d 136, 139-40 (1st Cir. 2000).

In this instance, the record contains the accounts of not one but three participants in the conspiracy, all of whom incriminate the defendant. The testimony of each of these witnesses corroborates the others' testimony. The record also contains circumstantial evidence tending to support an inference of the defendant's participation in the drug trade, such as his possession of a money counting machine and the presence of secret compartments in his car.

To say more on this point would be supererogatory. Sustaining a conviction requires only that, "eschewing credibility judgments and drawing all reasonable inferences in favor of the verdict," a rational jury could have found the defendant guilty based on the proof presented. United States v. Sepulveda, 15 F.3d 1161, 1173 (1st Cir. 1993). Measured against this benchmark, the evidence here supports a finding of the defendant's guilt with respect to both conspiracy to commit and aiding and abetting drug distribution simpliciter.

This leaves only the fourth component of the test. That factor is satisfied because, in the circumstances of this case, the defendant would not be unfairly prejudiced by an order holding him responsible for a lesser included offense. After all, references to section 841(a)(1) are featured prominently in the indictment, and all of the elements of a section 841(a)(1) charge are encompassed within a section 860(a) charge. It follows that the defendant had notice of those elements and both opportunity and incentive to defend against them.[3] See Smith, 13 F.3d at 383.

Here, moreover, the defendant fully availed himself of that opportunity. He vigorously contested many of the common elements of the charge, including the government's allegations as to his role in the unlawful drug distribution enterprise. The defendant offers no plausible reason to believe that his defense would have been materially different had the indictment focused on section 841(a)(1) rather than on section 860(a).

To cinch matters, the special verdict form yields steadfast assurance that the jury must have found facts beyond a reasonable doubt on all the elements needed to convict for the lesser included offense. We conclude, therefore, that the entry of

---

[3] The appellant did not choose to order a transcript of the jury instructions, see Fed. R. App. P. 10(b)(1), but other materials in the record make it appear very likely that a lesser included offense instruction was not given. We do not pursue the point, however, because the presence or absence of such an instruction would not materially impact our prejudice analysis in this case.

a conviction under section 841(a)(1) would not work any injustice. See Rojas Alvarez, 451 F.3d at 328-29 (vacating conviction under section 860(a) and directing entry of lesser included offense conviction under section 841(a)(1)); Parker, 30 F.3d at 553 (same); Smith, 13 F.3d at 383 (same).

This brings us full circle. Because every aspect of the multi-step test has been satisfied here, we vacate the convictions to the extent that they embody a finding of proximity to a youth center (section 860(a)) and direct the entry of convictions for conspiracy and aiding and abetting with respect to the distribution of drugs simpliciter (section 841(a)(1)).

## III. ALLEGED TRIAL ERRORS

The defendant advances three claims of trial error. We address these claims separately.

### A. Alleged Prosecutorial Misconduct.

The defendant avers that the prosecutor frustrated the fairness of his trial by making improper head and eye movements during witness testimony, objecting indiscriminately during defense counsel's opening statement and closing argument, and employing an inappropriate analogy during rebuttal. Preserved claims of prosecutorial misconduct are reviewed de novo. See United States v. Ayala-García, 574 F.3d 5, 16 (1st Cir. 2009). Unpreserved claims are reviewed only for plain error. See Sánchez-Berríos, 424 F.3d at 73; see also United States v. Duarte, 246 F.3d 56, 60 (1st

Cir. 2001) (limning plain error standard). Here, however, this distinction is academic because we discern no error, plain or otherwise.

We begin with the defendant's allegation that the prosecutor nodded her head and used eye movements to indicate agreement while cooperating witnesses were testifying, thus simultaneously leading and vouching for them. It is a baseline rule that a prosecutor may not "place[] the prestige of her office behind the government's case by, say, imparting her personal belief in a witness's veracity." United States v. Pérez-Ruiz, 353 F.3d 1, 9 (1st Cir. 2003). Head-nodding and eye movements, such as are alleged here, theoretically can cross this line and can constitute improper vouching. See, e.g., United States v. Collins, 78 F.3d 1021, 1039 (6th Cir. 1996); United States v. Bermea, 30 F.3d 1539, 1563 (5th Cir. 1994). Coaching witnesses through, say, head-nodding and eye movements is different than vouching — but using gestures for that purpose is equally improper. See, e.g., United States v. Casas, 425 F.3d 23, 46-47 (1st Cir. 2005).

The problem here is that the defendant made no contemporaneous objections to any instances of supposed vouching or coaching. While he twice voiced accusations of this sort to the district court, he waited on each occasion until days after the challenged conduct allegedly occurred. These objections were too

-17-

little and too late, and the record contains no evidence that any head-nodding or other inappropriate gestures ever occurred.

Although this absence of record evidence is enough to defeat the defendant's claim, there is more. When the defendant voiced his belated objection for the second time, the trial judge (an astute and experienced jurist) stated that she had "been keeping an eye on everyone" and had not observed any impropriety. The defendant has offered us no sound reason for second-guessing that first-hand assessment.

The defendant next complains that the prosecutor tainted the trial by objecting ten times during his counsel's opening statement and seventeen times during his counsel's closing. Although constant, overzealous, and unwarranted objections may unfairly impair a defendant's right to a fair trial, cf. United States v. Young, 470 U.S. 1, 13 (1985) (explaining that "interruptions of arguments . . . are matters to be approached cautiously"), we are unable to find any misconduct here. Most of the objections about which the defendant complains were either sustained by the court or elicited clarifications. The rest seem well within the pale. Counsel should not be held to standards of perfection, cf. United States v. Polito, 856 F.2d 414, 418 (1st Cir. 1988) (explaining that a criminal defendant is entitled to a fair trial, not necessarily a perfect trial), and the failed objections here do not seem so groundless as to be vexatious.

-18-

The defendant's caterwauling about the prosecutor's chosen analogy fares no better. The government's case was built largely on the testimony of three relatively low-level coconspirators who identified the defendant as a co-owner of the drug point. During the trial, the defendant attempted to undercut this testimony by stressing that the cooperating witnesses had little or no personal contact with him. In her final rebuttal argument, the prosecutor rejoined by likening the defendant to the chief executive officer of a large, multi-branch bank: though ordinary branch employees may not ever see the chief executive officer "filling up the ATM machines," they still know that "he is the boss."

Although the defendant now argues that this analogy was inapt, he did not object to it at trial. In this instance, the prosecutor's analogy was not perfect — indeed, few analogies are — but it effectively conveyed to the jury the possibility that low-level employees can have knowledge about an organization's leadership without having any personal interaction with the leader. We discern no prosecutorial misconduct.[4]

---

[4] In all events, an unpreserved objection to a closing argument requires reversal of a conviction "only if the illegitimate portion of the . . . argument so poisoned the well that the trial's outcome was likely affected." United States v. Taylor, 54 F.3d 967, 977 (1st Cir. 1995) (internal quotation marks omitted). It is nothing short of fanciful to suggest that the prosecutor's analogy might have had so damaging an effect.

## B.  **The Jencks Claim.**

We turn now to the defendant's claim that, despite a timely request for disclosure, the government failed to produce certain materials, in violation of the Jencks Act, 18 U.S.C. § 3500.  The materials comprise so-called DEA-6 reports of witness interviews compiled by the Drug Enforcement Administration (DEA).

The Jencks Act obliges the government, once a witness has testified, to proffer upon a defendant's timely request any statement of that witness in its possession, whether or not exculpatory, that relates to the subject matter of the witness's testimony.  See id. § 3500(b); see also United States v. Colón-Díaz, 521 F.3d 29, 38 (1st Cir. 2008); United States v. Neal, 36 F.3d 1190, 1197 (1st Cir. 1994).  The statute defines "statement" to include, in addition to an adopted writing of the witness or an exact recording of an oral pronouncement, any contemporaneously-made recording or transcription which amounts to "a substantially verbatim recital of a[ witness's] oral statement."  18 U.S.C. § 3500(e); see United States v. Gonzalez-Melendez, 570 F.3d 1, 4 (1st Cir. 2009) (per curiam).  We review preserved claims of Jencks error for abuse of discretion, see Colón-Díaz, 521 F.3d at 39, mindful that a material error of law invariably constitutes an abuse of discretion, see United States v. Snyder, 136 F.3d 65, 67 (1st Cir. 1998).

During the trial, the defendant made several requests for Jencks material. Those requests, however, were not limited to Jencks material but simultaneously sought material potentially useable for impeachment (so-called Giglio material, see Giglio v. United States, 405 U.S. 150 (1972)). These combined requests focused on the DEA-6 reports, including those created following government interviews of the three testifying coconspirators.

The trial judge, tramping down a well-trod path, see Palermo v. United States, 360 U.S. 343, 354 (1959), conducted a careful in camera review of the DEA-6 reports. She ordered disclosure of two reports, presumably as Giglio material, which contained potential contradictions of a government witness's testimony. She refused to order production of the remaining reports, impliedly finding that those reports did not constitute Jencks material. The defendant's challenge is addressed to this implied finding; no Giglio challenge is advanced.

We discern no abuse of discretion in the district court's refusal to order production of the DEA-6 reports under the Jencks Act. We have examined the DEA-6 reports that were preserved for appellate review, and we find them to be narrative summaries prepared by DEA agents. They are not substantially verbatim witness accounts. We therefore conclude, as did the Fifth Circuit when confronted with a group of DEA-6 reports, that the reports withheld are not Jencks material at all but, rather, "short,

-21-

concise, summaries of the witnesses' version of the facts as recounted to the agents." United States v. Weintraub, 871 F.2d 1257, 1260 (5th Cir. 1989) (internal quotation mark omitted). Jencks only inures to statements that can "fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations, and interpolations." Palermo, 360 U.S. at 350. The DEA-6 reports at issue here do not pass through this screen.

### C. **Multiplication Evidence.**

The defendant argues that the district court erred in admitting certain aspects of the testimony of a forensic chemist called by the government. The chemist, after being qualified as an expert, testified as to the average per-bag weights of marijuana contained in the small and large bags habitually sold at the drug point. The defendant presses no objection to this testimony.

There was evidence, apart from the chemist's testimony, that at least 250 bags of each size were sold at the drug point every day over the life of the conspiracy. Using this evidence as a foundation, the prosecutor asked the witness to perform some basic multiplication. This included multiplying the weight that the witness had ascribed to a typical small bag by 250 (representing daily small-bag sales), multiplying the weight ascribed to a typical large bag by 250 (representing daily large-bag sales), multiplying each of those subtotals by 365

-22-

(representing days in a year), and then multiplying each of those subtotals by nine (representing years of operation). The government elicited this testimony in an apparent effort to estimate how much marijuana had been sold over the life of the conspiracy.

The defendant's first objection is that this evidence had a tendency to mislead or confuse the jury because the underlying sales volume and years of operation were in dispute. Although the defendant does not specifically invoke Federal Rule of Evidence 403, his argument seems to be that any probative value that the evidence might have had was substantially outweighed by its capacity to mislead or confuse the jury.

Appellate review of district court rulings admitting or excluding evidence under the aegis of Rule 403 starts with a recognition that a trial judge is in the best position to assess the collateral effects of proffered testimony. See United States v. Raymond, 697 F.3d 32, 38 (1st Cir. 2012). "Only rarely — and in extraordinarily compelling circumstances — will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." United States v. Pires, 642 F.3d 1, 12 (1st Cir. 2011) (quoting Freeman v. Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988)).

The record here offers no reason for disturbing the district court's Rule 403 determinations. The foundational quantity-and-time evidence relied on by the government was in the record. Although these facts were not gospel — it remained for the jury to decide whether to accept or reject them — the direct examination was carefully phrased so that the chemist, by doing the requested multiplication, was not vouching for components such as how much business was transacted at the drug point or how long the conspiracy lasted. And the defense was free to build its own theory, asking the chemist on cross-examination to multiply by smaller numbers or fewer years. It did not exploit this opportunity.

The defendant has another string to his bow: he argues that the multiplication evidence was incorrectly admitted as Rule 702 expert testimony. This argument, too, is futile.

The defendant posits that the testimony was outside the chemist's field of expertise and, thus, outside the scope of Rule 702. But the Evidence Rules do "not distinguish between expert and lay <u>witnesses</u>, but rather between expert and lay <u>testimony</u> [so] it is possible for the same witness to provide both lay and expert testimony in a single case." Fed. R. Evid. 701 advisory committee's note on the 2000 amendments (emphasis in original). The record is indistinct as to whether the challenged multiplication testimony was admitted as expert testimony under

-24-

Rule 702 or as lay opinion testimony under Rule 701.  We start, therefore, by clarifying that point.

"The line between expert testimony under Fed. R. Evid. 702 . . . and lay opinion testimony under Fed. R. Evid. 701 . . . is not easy to draw . . . ."  United States v. Colón Osorio, 360 F.3d 48, 52-53 (1st Cir. 2004).  Be that as it may, we have scant difficulty in concluding that Rule 701 is the better fit for simple multiplication of the sort that the chemist performed here.  Lay opinion is generally thought to encompass information that can be deduced "from a process of reasoning familiar in everyday life."  Fed. R. Evid. 701 advisory committee's note on the 2000 amendments (internal quotation mark omitted).  Simple arithmetic, such as ordinary multiplication, is a paradigmatic example of the type of everyday activity that goes on in the normal course of human existence.  One does not need a graduate degree in chemistry to master multiplication: in this country, that subject is universally taught in elementary schools.  Without such a rudimentary skill, ordinary tasks such as figuring a family's budget, shopping in a supermarket, and converting a recipe for four into a meal for ten would assume Herculean proportions.

The bottom line is that the district court did not abuse its discretion in permitting the chemist to perform simple multiplication.  Nor did it abuse its discretion in admitting the products of the chemist's multiplication as lay opinion testimony.

## IV.  SENTENCING ISSUES

The defendant attempts to raise two sentencing issues. However, the first of these is a non-issue: though the defendant protests that his 210-month incarcerative sentence is substantively unreasonable, our vacation of the section 860(a) convictions and our direction to enter instead section 841(a)(1) convictions, see supra Part II, require resentencing.  See United States v. García-Ortiz, 657 F.3d 25, 31 (1st Cir. 2011) (calling for resentencing when partially successful appeal likely affects the "sentencing package").  Because it is unlikely that the same sentence will be imposed for these lesser charges, evaluating the substantive reasonableness of the original sentence would be a purely academic exercise.  See United States v. Wallace, 461 F.3d 15, 45 (1st Cir. 2006).

This leaves the defendant's challenge to the district court's drug-quantity determination.  Even though resentencing is required, this claim of error remains live.  After all, drug quantity is likely to form an integral part of the revised sentencing calculus.  Cf. United States v. Ventura, 353 F.3d 84, 87 (1st Cir. 2003) (explaining that drug quantity is an important sentencing factor in narcotics cases).

In a drug conspiracy case, setting the defendant's guideline range requires an attribution to him of the amount of drugs that were reasonably foreseeable to him.  See United States

-26-

v. Colón-Solís, 354 F.3d 101, 103 (1st Cir. 2004).  We review a sentencing court's drug-quantity attribution for clear error.  See United States v. Platte, 577 F.3d 387, 392 (1st Cir. 2009).  This review is deferential, and the district court's determination will be upheld "so long as the approximation represents a reasoned estimate of actual quantity."  United States v. Cintrón-Echautegui, 604 F.3d 1, 6-7 (1st Cir. 2010).

The court below started from the supportable foundation that, on average, the small bags of marijuana sold at the drug point weighed 0.59 grams and the large bags weighed 1.51 grams apiece.  The court then explained that both kinds of bags were delivered to the drug point in larger "bundles," with each bundle comprising 25 bags.  The drug point operated around the clock, in 12-hour shifts.  The court estimated that five bundles of small bags and two bundles of large bags were sold during a typical shift.  Noting that the drug point had operated 7 days per week, 52 weeks per year from 1999 through 2008, the court made a series of calculations and arrived at a total drug quantity of 977 kilograms of marijuana.  In light of the defendant's status as both the conspiracy's marijuana supplier and a co-owner of the drug point, the court found that this quantity was reasonably foreseeable to him.

The defendant's assault on this drug-quantity calculation centers on the factual predicate employed by the sentencing court.

-27-

This assault starts with the court's use of a nine-year figure as the multiplier representing the life of the conspiracy. He insists that, regardless of how long the conspiracy lasted, no witness dated his participation in it to any time before 2000.

Even if we accept the factual premise on which this argument rests, the argument does not take the defendant very far. Testimony from a coconspirator (Ortiz) places the defendant in the conspiracy no later than the beginning of 2000; and the record supports a finding that the defendant continued to toil within the conspiracy until his arrest in November 2008. This is an interval of roughly nine years, so the sentencing court's use of a nine-year multiplier was not clearly erroneous.

The defendant next questions the district court's conclusion that each bundle was composed of 25 bags. While he admits that one of the coconspirators testified to this bundle size, he points out that other coconspirators testified differently. This argument is meritless. "[I]f there are two plausible views of the record, the sentencing court's choice between them cannot be clearly erroneous." United States v. Santos, 357 F.3d 136, 141 (1st Cir. 2004).

The third branch of the defendant's attack opens a new front. The record indicates that, after 2005, the defendant rented the drug point to others, rather than operating it himself. He

argues that he should not be held fully responsible for the drugs sold by his tenants.

The defendant's thesis is wrong. The relevant inquiry for sentencing purposes is not limited to the quantity of drugs personally handled by the defendant or his direct subordinates but, rather, encompasses the entire quantity of drugs that the defendant could reasonably foresee would be within the ambit of the conspiracy. See United States v. Cortés-Cabán, 691 F.3d 1, 27 (1st Cir. 2012), cert. denied, 131 S. Ct. 2765 (2013); Colón-Solís, 354 F.3d at 103 & n.2. The defendant was still part of the conspiracy while renting the drug point, and the record leaves little room to doubt that he was aware of (and, thus, could foresee) the amount of drugs sold by his tenants. No more was exigible to undergird the district court's drug-quantity attribution for the period when the rental agreement was in effect.

We add a coda. On this record, the district court's drug-quantity finding was not only fully supportable but also extremely conservative. The record makes manifest that a considerable volume of crack cocaine was sold at La Trocha on the defendant's watch. Yet, the court made no reference at all to the defendant's culpability for this substantial amount of contraband.

## V. FORFEITURE

The defendant's final claim of error relates to forfeiture. He says that the $1,000,000 forfeiture judgment

violates the Excessive Fines Clause of the Constitution, U.S. Const. amend. VIII.

The forfeiture in this case clearly constituted punishment for an offense. It followed the defendant's conviction on felony charges and was imposed as part of his sentence. See United States v. Bajakajian, 524 U.S. 321, 328 (1998); United States v. Heldeman, 402 F.3d 220, 223 (1st Cir. 2005). The Excessive Fines Clause proscribes a criminal forfeiture judgment for an amount that is "grossly disproportional to the gravity of [the underlying] offense." Bajakajian, 524 U.S. at 334. Because the defendant contends for the first time on appeal that the $1,000,000 forfeiture amount violates this proscription, our review is limited to plain error. See United States v. Aquasvivas-Castillo, 668 F.3d 7, 16 (1st Cir. 2012).

The question, then, is whether the forfeiture judgment is grossly disproportional to the offenses of conviction.[5] In responding to this question, we consider "(1) whether the defendant falls into the class of persons at whom the criminal statute was principally directed; (2) other penalties authorized by the legislature (or the Sentencing Commission); and (3) the harm caused by the defendant." Heldeman, 402 F.3d at 223. When the forfeiture judgment is less than the maximum authorized fine, a defendant who

---

[5] For this purpose, we assume, favorably to the defendant, that the correct comparison is to the lesser included offenses (21 U.S.C. § 841(a)(1)).

purposes to challenge its constitutionality faces an especially steep uphill climb.  Id. at 223 & n.1 (collecting cases).

We need not tarry over the first factor.  Trafficking in drugs is conduct that falls within the heartland of the criminal forfeiture statutes.  See United States v. Keene, 341 F.3d 78, 86 (1st Cir. 2003).  The second factor likewise favors the government; the maximum fine for the quantity of marijuana attributable to the defendant is $5,000,000.  See 21 U.S.C. § 841(b)(1)(B); USSG §5E1.2(c)(4).  Put in this perspective, a forfeiture judgment of $1,000,000 raises no eyebrows.

The third factor is of a piece with the first two factors.  Drug trafficking is a scourge and is the source of untold harm.  Given the large quantity of drugs purveyed by the conspiracy and the defendant's leading role in that conspiracy, it strains credulity to suggest that a $1,000,000 fine is grossly disproportionate to the harm inflicted.

The defendant has a fallback position.  Although the Bajakajian Court did not explicitly so hold, this circuit has suggested that "it is not inconceivable that a forfeiture could be so onerous as to deprive a defendant of his or her future ability to earn a living, thus implicating the historical concerns underlying the Excessive Fines Clause." United States v. Levesque, 546 F.3d 78, 85 (1st Cir. 2008).  The defendant maintains that the

forfeiture judgment in this case is so extravagant as to deprive him of his livelihood.

Like the defendant's gross disproportionality argument, this argument was not raised below. Our review is, therefore, solely for plain error. See Aquasvivas-Castillo, 668 F.3d at 16. We discern none.

Assuming, without deciding, that deprivation of livelihood can constitute a basis for setting aside a criminal forfeiture judgment, one thing is clear: it is the defendant's burden to establish a record at the district court level that could sustain a deprivation of livelihood claim. See id. In this case, the defendant has failed to make such a record.

Here, moreover, the district court made findings, warranted by the evidence, that during the period of the defendant's involvement the conspiracy grossed between $6,145,200 and $15,010,600 from marijuana sales alone. The defendant was an equity partner, yet has not shown what happened to his share of the profits. With this unanswered question dominating the landscape, it simply cannot be said that the record compels a conclusion that the forfeiture judgment has deprived the defendant of his livelihood.

For these reasons, we leave the forfeiture judgment undisturbed.[6]

## VI. CONCLUSION

We need go no further. For the reasons elucidated above, we vacate the defendant's convictions to the extent that they implicate 21 U.S.C. § 860(a) and order the entry of new convictions under 21 U.S.C. § 841(a)(1). Additionally, we reject the defendant's other claims of error and affirm the forfeiture judgment. Finally, we vacate the defendant's sentence and remand for resentencing on the lesser included offenses.

**So Ordered.**

**- Concurring Opinion Follows -**

---

[6] We think it unlikely that the substitution of convictions for lesser included offenses will have any effect on the sentencing court's quantification of the $1,000,000 forfeiture amount. Cf. United States v. Garcia Abrego, 141 F.3d 142, 173-74 (5th Cir. 1998) (affirming forfeiture judgment, even if based partially on dismissed counts, because core illegal conduct and resulting proceeds were not implicated by the dismissals). But should the court wish to revisit this quantification on remand, it is free to do so.

**TORRUELLA, <u>Circuit Judge</u>, concurring.** I join in full my colleagues' well-reasoned opinion. I write in concurrence only to alert the district court to consider the potential impact of the Supreme Court's decision in <u>Alleyne</u> v. <u>United States</u>, 133 S. Ct. 2151 (2013). <u>Alleyne</u> requires that all facts increasing a defendant's statutory minimum sentence be proved beyond a reasonable doubt. <u>Id.</u> at 2161-63. Because neither party briefed the potential application of <u>Alleyne</u> to this case, on remand the district court is best positioned to consider whether <u>Alleyne</u>'s holding is relevant to Sepúlveda's sentencing under 21 U.S.C. § 841(a)(1) and its attendant penalty provision, <u>id.</u> § 841(b)(1).